David A. Straite
DICELLO LEVITT LLP
485 Lexington Ave., Suite 1001
New York, NY 10017
(646) 933-1000
dstraite@dicellolevitt.com

*Attorneys for Plaintiff and the Proposed Class*
*(additional counsel listed in signature block)*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANDREW COOK, on behalf of himself and all others similarly situated,<br><br>*Plaintiff*,<br><br>*v.*<br><br>CONDUENT INCORPORATED AND CONDUENT BUSINESS SERVICES, LLC,<br><br>*Defendants.* | CLASS ACTION COMPLAINT & JURY DEMAND |

Plaintiff Andew Cook ("Plaintiff") brings this class action complaint against Defendants Conduent Business Services, LLC and Conduent, Inc., (together, "Conduent" or "Defendants"), on behalf of himself and all others similarly situated. Plaintiff makes the following allegations based upon personal knowledge as to his own actions and upon information and belief as to all other matters:

## INTRODUCTION

1. Plaintiff brings this class action against Defendants for their failure to secure and safeguard the highly sensitive Personally Identifiable Information ("PII") and Protected Health Information ("PHI"), (together, "Private Information"), of millions of individuals, including names, Social Security numbers, full dates of birth, medical information (including treatment and diagnosis codes, provider names, dates of service and claim amounts), and health insurance policy or ID numbers, and for failing to provide adequate and timely notice regarding the breach of this data to Plaintiff and other Class Members.

2. Conduent is a national provider of business solutions and services to government, commercial, transportation, and healthcare sector clients ("clients") who regularly deals with the type of sensitive information Plaintiff provided. Conduent's services are used by 90% of the top U.S. health insurers, processing over 800 million claims annually for Americans. They offer a full range of services to the healthcare insurance industry including claims processing and administration, member enrollment and billing, care coordination, and data management and analysis. In order for Conduent to provide these services to its clients, those clients give Conduent access to their customers' PII and PHI, including that of Plaintiff and the other Class Members. Plaintiff was a customer of

a Conduent client, non-party Health Care Service Corporation ("HCSC"), a Mutual Legal Reserve Company d/b/a Blue Cross Blue Shield of Illinois ("BCBSIL").

3. Defendants collected, used, and derived a benefit from Plaintiff's and Class Members' PII and PHI, yet breached their duties by failing to implement or maintain adequate security practices.

4. Due to the nature of its business, Conduent receives and maintains PII and PHI for millions of individuals across the country. Conduent owed a duty to Plaintiff and Class Members under federal law (including duties imposed by Section 5 of the FTC Act), common law, and pursuant to industry standards, to protect the PII and PHI it obtained from Plaintiff and the other Class Members from unauthorized access and disclosure by implementing and maintaining reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class Members' Private Information from unauthorized access and disclosure.

5. Additionally, as a HIPAA business associate that processes claims, manages benefits, and handles sensitive health information on behalf of health insurance plans, Conduent had a duty to protect the PII and PHI of these individuals under the HIPAA Security Rule. The HIPAA Security Rule has comprehensive data security requirements, including requirements for encryption of protected health information, implementation of access controls and intrusion detection, conducting regular risk assessments, and providing timely breach notifications. Conduent

breached that duty by failing to implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class Members' PII and PHI from unauthorized access and disclosure.

6. On January 13, 2025, Conduent discovered that a cybercriminal had accessed its computer servers and network. The investigation that followed showed that the cybercriminal, an unauthorized third-party, had access to its IT Network from October 21, 2024, to January 13, 2025 and used that access to exfiltrate the PII and PHI of over 10.5 million customers of Conduent clients, making it the largest healthcare data breach of 2025 and the 8th largest healthcare data breach in history.[1]

7. In February 2025 the ransomware group Safepay claimed responsibility for the breach, posting on its dark web leak site that it stole 8.5 terabytes of data. It also demanded a ransom from Conduent and threatened to publish the stolen PII and PHI. Conduent has provided no public information on the ransom demand or payment. There is reason to believe that, as a result, the data of Plaintiff and Class Members has been released on the dark web.

---

[1] Steve Adler, *More Than 10.5 Million Patients Affected by Conduent Business Solutions Data Breach*, The HIPAA Journal (Oct. 28, 2025), https://www.hipaajournal.com/conduent-business-solutions-data-breach.

8. Despite learning about the breach on January 13, 2025, and knowing the severity of the incident by the February ransom demand, Conduent first began notifying state Attorney Generals on or around October 8, 2025, and consumers on or around October 24, 2025. This was a full ***nine months after the breach*** was detected, preventing Plaintiff and Class Members from mitigating the risk of imminent harm that could result from the Data Breach.

9. Plaintiff and Class Members had no idea their Private Information had been compromised and stolen and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm, including medical identity theft and fraud.

10. Plaintiff provided this information to BCBSIL because it was required in order to access his health insurance. Now, his personal information is in the hands of criminals and potentially released on the dark web for anyone to access.

11. Conduent failed to monitor and implement proper security practices and safeguards.

12. As a direct result of the Data Breach, Plaintiff and Class Members have suffered fraud and/or will continue to be exposed to a heightened and imminent risk of fraud and identity theft, potentially for the rest of their lives. Plaintiff and Class Members must now and in the future closely monitor their

financial and other accounts to guard against social engineering attacks and identity theft.

13. Plaintiff and Class Members also now face significantly heightened risk of medical fraud and the publication of private medical information.

14. Plaintiff and Class Members have incurred and will continue to incur out-of-pocket costs, such as purchasing credit monitoring services, identity theft protection services, social engineering protection services, credit freezes, credit reports, and other protective measures to deter and detect identity theft.

15. As a direct and proximate result of the Data Breach and subsequent exposure of their Private Information, Plaintiff and Class Members have suffered, and will continue to suffer damages and economic losses in the form of lost time needed to take appropriate measures to avoid unauthorized and fraudulent charges, putting alerts on their credit files, and dealing with spam phone calls, letters, and emails received as a result of the Data Breach.

16. As a result of Defendants' failure to protect the sensitive information they were entrusted to safeguard, Plaintiff and Class Members did not receive the benefit of their bargain with Defendants and now face a significant risk of medical-related theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

17. As a result of Defendants unreasonably and intentionally delaying disclosure of the Data Breach, Plaintiff and Class Members were left without the knowledge that their Private Information had been compromised by cybercriminals, and that there were steps they should take to protect themselves from the resulting risk of harm including medical-related theft and fraud, financial fraud, and other identity-related fraud.

18. Plaintiff brings this action on behalf of himself and all persons whose PII and/or PHI was exposed as a result of the Data Breach, and asserts claims for a negligence and negligence *per se* and seeks monetary damages, punitive damages, declaratory relief, injunctive relief, equitable relief, reasonable attorneys' fees, costs, and expenses incurred in bringing this action, and all other relief authorized by law.

## **PARTIES**

19. Plaintiff Andrew Cook is a citizen and resident of Ohio. Plaintiff received a notice from Conduent on or about October 24, 2025, that his information was exposed in the data breach at issue in this litigation. Because of the notice, Plaintiff is subject to a heightened risk of fraud and taking proactive measures upon the advice from Conduent that he "remain vigilant against the potential for identity theft and fraud and monitor [his] credit reports for any suspicious activity."

20. Defendant Conduent Incorporated is a New York corporation with its principal place of business at 100 Campus Drive, Suite 200 Florham Park, New Jersey 07932.

21. Defendant Conduent Business Services, LLC is a Delaware corporation with its principal place of business at 100 Campus Drive, Suite 200 Florham Park, New Jersey 07932. It is a single-member LLC owned entirely by Conduent Incorporated.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million exclusive of interest and costs. There are more than 100 putative Class Members and at least some members of the proposed Class, including Plaintiff, have a different citizenship from Defendants. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged herein form part of the same case or controversy.

23. This Court has general personal jurisdiction over Conduent Defendants because they have their principal place of business in this state.

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) (1) & (2) because a substantial part of the events and omissions giving rise to this action occurred in and emanated from this District.

## FACTUAL ALLEGATIONS

***Overview of Defendants and their Promises***

25. Non-party HCSC is a health insurer with over 23 million members.[2] It is the licensee of the Blue Cross and Blue Shield Association of Illinois, Montana, New Mexico, Oklahoma, and Texas.

26. In the regular course of business, HCSC collects and stores patients' highly sensitive PII and PHI including their names, addresses, driver's license numbers, dates of birth, medical information (including diagnosis and treatment information, physician names, dates of service, and claim amounts), health insurance information, and Social Security numbers.

27. As a condition of providing health insurance services, HCSC collected, stored, shared, and maintained Plaintiff's and Class Members' PII and PHI, including in the Conduent systems involved in the Data Breach.

28. HCSC shared Plaintiff and Class Members' PII and PHI with Conduent in the course of using services provided by Conduent.

29. Conduent, Inc. is a digital business solutions and services company that works with commercial, government, and transportation industries including a large number of healthcare entities. Conduent Business Solutions, LLC specifically

---

[2] HCSC, *2024 Annual Report*, https://www.hcsc.com/documents/hcsc-annual-report-2024.pdf (last visited Nov. 6, 2025).

is a subsidiary of Conduent, Inc. and a third-party service provider that offers printing/mailroom services, document processing services, payment integrity services, government benefit services, and other back-office support services. In the healthcare industry, Conduent Defendants "deliver administration, clinical support, claims management and patient assistance solutions across the healthcare ecosystem," handling "claims processing, care integration, subrogation and payment integrity solutions for managed care companies, and intake mailroom/data capture and medical management services for claims payers and third-party administrators."[3] Conduent processes 800 million health insurance claims annually, works with nine of the ten top U.S. health insurers,[4] and serves government healthcare programs for 119 million recipients in 34 states plus D.C.[5] In 2024, they reported over $1.6 billion in revenue from the commercial division alone.[6]

30. In providing these services Conduent acknowledges they "receive, process, transmit and store substantial volumes of information relating to identifiable individuals, both in [their] role as a solution provider and as an

---

[3] *Id.*
[4] *See* Conduent, *Healthcare Business Solutions*, https://www.conduent.com/healthcare-business-solutions/ (last visited Nov. 6, 2025).
[5] Conduent, *2024 Annual Report*, https://investor.conduent.com/static-files/feda5a28-eabe-4fea-8241-7e4685fbe660 (last visited Nov. 6, 2025).
[6] *Id.*

employer, and [they] are subject to numerous laws, rules and regulations in the United States (both federal and state) and foreign jurisdictions designed to protect both individually identifiable information as well as personal health information."[7] Conduent is responsible for developing and maintaining systems that collect and process personal data, including health information, for hundreds of millions of Americans.

31. In the regular course of its business, Conduent provided back-office support services to HCSC, including digital document processing, digitizing and processing physical mail, and health care claims payment processing.[8] Through the processing and storage of healthcare documents, letters, and claims Conduent maintained Plaintiff and Class Members' PII and PHI.

32. On its public privacy policy page, Conduent states its "commitment to data privacy goes beyond the minimum legal and regulatory requirements and strives for best-in-class data protection and privacy management" and claims that only Conduent authorized personnel and "third-party service providers with a legitimate need to know are provided access to personal data, and these employees

---

[7] *Id.*

[8] Conduent, *Notice of Data Incident*, https://www.conduent.com/notice-2913678/ (last visited Nov. 6, 2025).

and third-party service providers are required to treat this information as confidential where applicable."[9]

33. Conduent was on notice that it held particularly sensitive information that was especially valuable to hackers. In its annual report it stated, "we have in the past been, and remain, susceptible to breach of security systems which may result and has resulted in unauthorized access to our facilities and those of our customers and/or the information we and our customers are trying to protect."[10]

34. In 2020, Conduent was the target of a smaller ransomware attack that resulted in a data breach, further putting them on notice.[11]

35. Despite recognizing their duty to do so and having notice of the importance, Defendants have not implemented reasonable cybersecurity safeguards or policies to protect consumers' PII and PHI or supervised their IT or data security agents and employees to prevent, detect, and stop breaches of their systems. As a result, Defendants left significant vulnerabilities in their systems for cybercriminals to exploit and gain access to consumers' Private Information.

---

[9] Conduent, *Data Privacy at Conduent*, https://www.conduent.com/privacy-policy/ (last updated Oct. 15, 2023).

[10] *Id.*

[11] Seth Adler, *Incident Of The Week: Maze Ransomware Targets Conduent And Aerospace Entity In Unrelated Incidents*, Cyber Security Hub (June 12, 2020), https://www.cshub.com/attacks/articles/incident-of-the-week-maze-ransomware-targets-conduent-and-aerospace-entity-in-unrelated-incidents.

***The Data Breach***

36. On or about January 13, 2025, Conduent discovered that a cybercriminal had accessed its computer servers and network.

37. The investigation that followed showed that the cybercriminal, an unauthorized third-party, had access to its IT Network from October 21, 2024, to January 13, 2025 and used that access to exfiltrate files containing the PII and PHI of over 10.5 million customers of Conduent clients, making it the largest healthcare data breach of 2025 and the 8th largest healthcare data breach in history.[12]

38. During this nearly 3-month period, the attackers operated inside Conduent's systems undetected, likely with administrative or high-level access given the duration and scope of the compromise.

39. In February 2025, the ransomware group "SafePay" claimed responsibility for the breach, posting on its dark web leak site that it stole 8.5 terabytes of data. It also demanded a ransom from Conduent and threatened to publish the stolen PII and PHI. Conduent has provided no public information on the ransom demand or payment.

---

[12] Steve Adler, *More Than 10.5 Million Patients Affected by Conduent Business Solutions Data Breach*, The HIPAA Journal (Oct. 28, 2025), https://www.hipaajournal.com/conduent-business-solutions-data-breach.

40. SafePay is a criminal organization that typically infiltrates a target's network, steals sensitive data, and then deploys ransomware to encrypt the victim's systems – using the stolen data as leverage to extort payment by threatening to publish or sell it. Conduent experienced a significant system outage in January 2025, suggesting a possible ransomware detonation, consistent with SafePay's typical operations. Conduent has not confirmed whether it paid a ransom to SafePay. While Conduent has not explicitly confirmed SafePay's involvement, it acknowledged in its April 2025 SEC filing that the breach was a deliberate cyberattack and that law enforcement was notified. SafePay's apparent involvement makes clear that sophisticated threat actors were behind the breach, and that Conduent's security was unable to keep them out or promptly detect their presence.

41. Moreover, despite learning about the breach on January 13, 2025, and knowing the severity of the incident by the February ransom demand, Conduent first began notifying state Attorney Generals on or around October 8, 2025, and consumers on or around October 24, 2025. This was a full nine months after the breach was detected.

42. Prompt action is critical for preventing harms that result from unauthorized access and acquisition of PII and PHI. The nine-month delay prevented Plaintiff and Class Members from mitigating the risk of imminent harm that could result from the Data Breach.

43. The stolen data contains at least the following information: names, Social Security numbers, dates of birth, and medical and health insurance information.

44. Upon information and belief, Conduent was targeted specifically because of its contracts with health insurance providers giving it access to PHI.

45. Cybercriminals do not normally post information that is obtained through a data breach immediately on the dark web. Given the intentional and criminal nature of the cybersecurity attack, Plaintiff's and Class Members' Private Information may be for sale on the dark web soon or several years from now, meaning that class members are at risk for fraud and identity theft for many years into the future.

46. Conduent's notice was not only delayed, but deficient. Conduent failed to disclose exactly what data was stolen, the criminal nature of the breach, the results of any investigations, and any steps it is taking to prevent further breaches in the future.

47. The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect the sensitive data in their possession, including Plaintiff's and Class Members' PII and PHI, from a foreseeable and preventable cyber-attack.

48. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PII and PHI was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure the data from those risks left that property in a dangerous condition.

49. Plaintiff's and Class Members' identities are now at a heightened risk of exposure because of Defendants' negligent conduct since the PII and PHI that Defendants collected and maintained is now in the hands of data thieves.

50. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal personal information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes.

***The Healthcare Sector Is Particularly Susceptible to Cyberattacks***

51. Defendants were or should have been on notice that the Federal Bureau of Investigation ("FBI") has been concerned about data security in the healthcare sector. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "'[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of

obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII).'"[13]

52. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[14]

53. The number of U.S. data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[15] In 2022, 1,802 data compromises were reported that impacted over 422

[13] Jim Finkle, *FBI warns healthcare firms that they are targeted by hackers*, Reuters (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[14] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n (Oct. 4, 2019), https://www.ama-assn.org/practice-management/ sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (emphasis omitted).

[15] *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScou*t, PR Newswire (Jan. 19, 2017), https://www.prnewswire.com/news-releases/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout-300393208.html.

million victims—marking a 42% increase in the number of victims impacted since 2021.[16] That upward trend continued with 3,158 data compromises totaling 1.3 billion notices sent out in 2024.[17]

54. The healthcare sector reported the second largest number of breaches among all measured sectors in 2024, with the highest rate of exposure per breach.[18] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential.[19]

55. In an article published on October 31, 2023, the HHS noted that "[r]ansomware and hacking are the primary cyber-threats in healthcare." According to HHS statistics, since 2019 there has been a 239% increase in large breaches reported to HHS' Office for Civil Rights and a 278% increase in ransomware attacks.[20]

---

[16] 2022 Annual Data Breach Report, Identity Theft Res. Ctr., https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited Nov. 6, 2025).

[17] *2024 Annual Data Breach Report*, Identity Theft Res. Ctr., https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf (Jan. 2025).

[18] *Id.*

[19] Tenable Security Response Team, *Healthcare Sec.*, Tenable (Mar. 10, 2021), https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches.

[20] Jeff Lagasse, *HHS settles $100K ransomware investigation*, Healthcare Finance (Nov. 2, 2023), https://www.healthcarefinancenews.com/news/hhs-settles-100k-ransomware-investigation (discussing the article).

56. Healthcare related data breaches also come at a cost to the breached entities. According to IBM's 2025 Cost of a Data Breach Report, the healthcare sector reported the highest average data breach costs for the twelfth year in a row in 2025 at $7.42 million.[21] This cost should only further incentivize entities that deal with PHI to both invest in and implement reasonable and adequate security measures in order to avoid financial repercussions in the event of a breach.

57. Defendants knew or reasonably should have known the importance of implementing reasonable and adequate practices and procedures in order to safeguard the PII and PHI entrusted to it.

58. Defendants knew, or reasonably should have known, the importance of safeguarding the Private Information entrusted to it, and of the foreseeable consequences if Defendants' data security systems were breached. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

[21] *Cost of a Data Breach Report 2025*, IBM, https://www.ibm.com/downloads/documents/us-en/131cf87b20b31c91 (1ast visited Nov. 7, 2025).

***The Value of Private Information and the Effects of Unauthorized Disclosure***

59. At all relevant times, Defendants were well aware that the Private Information they collect from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

60. The value of Private Information is axiomatic considering the value of "big data" in corporate America.

61. Private Information is also a valuable commodity to cyber attackers. The U.S. Attorney General confirmed in 2020 that "hackers" target consumers' sensitive personal information because it "has economic value."[22]

62. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use Private Information to commit an array of crimes including identify theft, and medical and financial fraud.[23] Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private Information on multiple underground websites, commonly referred to as the dark web.

---

[22] *Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice (Feb. 10, 2020), https://www.justice.gov/archives/opa/speech/attorney-general-william-p-barr-announces-indictment-four-members-china-s-military.

[23] *What to Know About Identify Theft*, Fed. Trade Comm'n, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited Nov. 7, 2025).

63. While credit card information and associated PII can sell for as little as $1-$2 on the black market, PHI can sell for as much as $363.[24]

64. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

65. Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "'Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery,'" reported Pam Dixon, executive director of World Privacy Forum. "'Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities.'"[25]

---

[24] *Data Breaches: In the Healthcare Sector,* Ctr. for Internet Sec., https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited Nov. 7, 2025).

[25] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, Kaiser Health News (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/.

66. Similarly, the FBI Cyber Division, in an April 8, 2014, Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.[26]

67. The ramifications of Defendants' failures to keep Plaintiff's and Class Members' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for 6 to 12 months or even longer.

68. Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

---

[26] *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI Cyber Div. (Apr. 8, 2014), https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf.

69. Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened.[27] This gives thieves ample time to seek multiple treatments under the victim's name. And 40% of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[28]

70. As companies operating in the health sector, Defendants knew, or reasonably should have known, the importance of safeguarding Plaintiff's and Class Members' Private Information entrusted to them, and of the foreseeable consequences if Defendants' data security systems were breached. This includes the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

---

[27] *See Medical ID Theft Checklist*, IdentityForce https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last updated Jan. 11, 2023).

[28] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches (“Potential Damages*”), Experian (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

***<u>Defendants Failed to Comply with FTC Rules</u>***

71. The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[29]

72. Defendants were prohibited by the Federal Trade Commission Act ("FTCA") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTCA.[30]

73. According to the FTC, the need for data security should be factored into all business decision-making.[31]

74. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for

[29] *Start with Security: A Gude for Business*, FTC, https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf (last visited Nov. 6, 2025).

[30] *See, e.g.*, *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 407 (E.D. Va. 2020) (citing *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015)).

[31] *Start with Security: A Gude for Business*, FTC, https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf (last visited Nov. 7, 2025).

businesses.[32] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

75. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[33] This is consistent with guidance provided by the FBI, HHS, and the principles set forth in the CISA 2020 guidance.

76. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of

---

[32] *Protecting Personal Information: A Guide for Business*, FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Nov. 6, 2025).

[33] *Start with Security: A Gude for Business*, FTC, https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf (last visited Nov. 6, 2025).

the FTCA, 15 U.S.C. §45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[34]

77. Defendants failed to properly implement basic data security practices. Defendants' failures to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. §45.

78. Defendants were or should have been aware of their obligations to protect the Private Information of Plaintiff and Class Members because of Defendants' position as a business which collects and stores PII and PHI. Defendants were also aware of the significant repercussions that would result from Defendants' failures to make good on those obligations.

***Defendants Failed to Comply With Industry Standards***

79. Several best practices have been identified that, at a minimum, should be implemented by companies in possession of Private Information, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multifactor

[34] *Privacy and Security Enforcement*, FTC, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement (last visited Nov. 6, 2025).

authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multifactor authentication.

80. Other best cybersecurity practices that are standard include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

81. In addition, to prevent and detect cyber attacks Defendants could and should have implemented, as recommended by CISA, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransom ware attacks. ...
- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) ....

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.
- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it. ...
- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.
- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.
- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters-and keep them updated-to reduce malicious network traffic….[35]

82. Defendants could have and should have implemented industry-standard cybersecurity measures, and required the same from their vendor, including meeting the minimum standards of the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

[35] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), https://www.cisa.gov/news-events/news/protecting-against-ransomware.

83. The foregoing frameworks are established and applicable industry standards for data security, and upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

***<u>Cybercriminals Have and Will Continue to Use Plaintiff's and Class Members' PII and PHI for Nefarious Purposes</u>***

84. Every year, identity theft causes tens of billions of dollars of losses to victims in the United States.[36] For example, with the PII stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[37] These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

[36] *Facts + Statistics: Identity Theft and Cybercrime*, Ins. Info. Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited Nov. 7, 2025) (discussing Javelin Strategy & Research's report *2018 Identity Fraud: Fraud Enters a New Era of Complexity*).

[37] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, USA Today (Nov. 2, 2017), https://www.usatoday.com/story/money/personalfinance/2017/11/15/5-ways-identity-thief-can-use-your-social-security-number/860643001/.

85. PII is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.

86. These risks are both certainly impending and substantial. As the FTC has reported, if cyber attackers get access to PII, they will use it.[38]

87. Cyber attackers may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

88. If cyber criminals manage to access PII, health insurance information, and other personally sensitive data, as is the case with this Data Breach, there is no limit to the amount of fraud to which Defendants may have exposed Plaintiff and Class Members.

[38] Ari Lazarus, *How fast will identity thieves use stolen info?*, FTC (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info.

89. Plaintiff's and Class Members' PII and PHI is of great value to cybercriminals, and the data stolen in the Data Breach can be used in a variety of ways for criminals to exploit Plaintiff and the Class Members and to profit off their misfortune and stolen information. The cybercriminals' motives for the Data Breach were purely nefarious and malicious in nature: their one goal was to access systems, including Defendants' systems, in order to obtain valuable Private Information to sell on the dark web.

90. Criminals can and do piece together bits and pieces of compromised personal information for profit, for example by developing "Fullz" packages.[39]

91. With "Fullz" packages, cyber-criminals can cross-reference two sources of personal information to marry unregulated data available elsewhere to

[39] "Fullz" is fraudster-speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm,* Krebs on Sec. (Sep. 18, 2014) https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.

criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

92. Then, this comprehensive dossier can be sold-and then resold in perpetuity-to crooked operators and other criminals (like illegal and scam telemarketers).

93. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used.

94. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[40]

95. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the

---

[40] U.S. Gov't Accountability Office, *Report to Congressional Requesters, Personal Information*, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims' identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

96. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

97. Furthermore, Plaintiff and Class Members face a substantial risk of future spam, phishing, or other attacks designed to trick them into sharing sensitive data, downloading malware, or otherwise exposing themselves to cybercrime, where their names, cellular data, and contact information were acquired in the Data

Breach. The substantial risk of future exploitation created by the Data Breach constitutes a redressable injury traceable to Defendants' conduct.

***<u>Defendants Owed a Duty to Plaintiff and Class Members to Keep Their Private Information Secure and Protect It From Being Compromised, Lost, Stolen, Accessed, or Misused</u>***

98. In addition to their obligations under state and federal laws and regulations, Defendants owed a common law duty to Plaintiff and Class Members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII and PHI in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties. This duty extends to Defendants' obligations to safeguard PII and PHI shared with service vendors who received Private Information from Defendants, and to conduct ongoing, robust due diligence into such service vendors prior to contracting and throughout any relationship.

99. Defendants further owed and breached their duties to Plaintiff and Class Members to implement processes and specifications that would detect a breach of Defendants' security systems in a timely manner and to timely act upon warnings and alerts, including those generated by Defendants' own security systems. Instead of implementing such processes and specifications, Defendants allowed the Data Breach to go undetected for months before recognizing unusual activity.

100. As a direct result of Defendants' intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, cyber attackers were able to access, acquire, view, publicize, and/or otherwise cause the theft and misuse to Plaintiff's and Class Members' PII and PHI as detailed above, and Plaintiff is now at a heightened and ongoing risk of identity theft and fraud.

101. The Data Breach was a direct and proximate result of Defendants' failure to: (a) properly safeguard and protect Plaintiff's and Class Members' PII and PHI from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' PII and PHI; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

102. Defendants had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite their obligation to protect Plaintiff's and Class Members' data, including their PHI.

103. Had Defendants remedied the deficiencies in Defendants' data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into their systems and, ultimately, the theft of Plaintiff's and Class Members' PII and PHI.

***<u>Loss of Time to Mitigate Risk of Identity Theft & Fraud and Other Impacts of the Data Breach on Victims</u>***

104. The Private Information exposed in the Data Breach is highly coveted and valuable on underground markets as it can be used to commit identity fraud, including medical-related identity theft and fraud, one of the most dangerous and costly forms of identity theft.

105. Conduent knows this, so it has warned consumers of the dangers of identity theft and has recommended that consumers take proactive measures in response to the data breach: "We encourage you to remain vigilant against the potential for identity theft and fraud and monitor your credit reports for any suspicious activity."

106. According to a *Reuters* investigation that included interviews with nearly a dozen healthcare executives, cybersecurity investigators, and fraud experts, medical data for sale on underground markets "includes names, birth dates, policy numbers, diagnosis codes and billing information" which fraudsters commonly use "to create fake IDs to buy medical equipment or drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers."[41]

---

[41] Caroline Humer & Jim Finkle, *Your medical record is worth more to hackers than your credit card*, Reuters (Sep. 24, 2014), https://www.reuters.com/article/us-cybersecurity- hospitals/your-medical-recordis-worth-more-to-hackers-than-your-credit-card- idUSKCN0HJ21I20140924.

107. According to Tom Kellermann, chief cybersecurity officer of cybersecurity firm Carbon Black, "Health information is a treasure trove for criminals [because] by compromising it, by stealing it, by having it sold, you have seven to 10 personal identifying characteristics of an individual."[42] For this reason, a patient's full medical records can sell for up to $1,000 on the dark web, while credit card numbers and Social Security numbers may cost $5 or less.[43]

108. As noted by Paul Nadrag, a software developer for medical device integration and data technology company Capsule Technologies: "The reason for this price discrepancy—like any other good or service—is perceived value. While a credit card number is easily canceled, medical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information. Once records are stolen, cybercriminals often tap into members of a criminal network on the dark web experienced in drug trafficking and money laundering who are eager to buy medical records to support their criminal activities, such as illegally

---

[42] Andrew Steger, *What Happens to Stolen Healthcare Data?*, Healthtech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[43] Chrissa McFarlane, *The Wake-Up Call: Your Health Data Is At Risk*, Forbes (Mar. 29, 2025), https://www.forbes.com/sites/chrissamcfarlane/2025/03/29/the-wake-up-call-your-health-data-is-at-risk/.

obtaining prescription medications, filing bogus medical claims or simply stealing the patient's identity to open credit cards and fraudulent loans."[44]

109. Indeed, while federal law generally limits an individual's responsibility for fraudulent charges on a credit card to $50, there are no such protections for a stolen medical identity. According to a 2015 survey on medical identity theft conducted by the Ponemon Institute, victims of medical identity theft spent an average of $13,500 in out-of-pocket costs to resolve the crime.[45] Frequently, this information was used to obtain medical services or treatments (59%), obtain prescription drugs (56%), or receive Medicare and Medicaid benefits (52%). Only 14% of respondents said that identity thieves used the information to obtain fraudulent credit accounts, indicating that medical information is a much more profitable market.[46]

110. According to the Ponemon study, "[t]hose who have resolved the crime spent, on average, more than 200 hours on such activities as working with

---

[44] Paul Nadrag, *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web*, Fierce Healthcare (Jan. 26, 2021), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web.

[45] *Fifth Annual Study on Medical Identity Theft*, PONEMON INSTITUTE (Feb. 2015), https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65 ("Ponemon Study").

[46] *Id.*

their insurer or healthcare provider to make sure their personal medical credentials are secured and can no longer be used by an imposter and verifying their personal health information, medical invoices and claims and electronic health records are accurate."[47]

111. Additionally, the study found that medical identity theft can have a negative impact on reputation as 45% of respondents said that medical identity theft affected their reputation mainly because of embarrassment due to disclosure of sensitive personal health conditions, with 19% responding that they missed out on employment opportunities as a result.[48]

112. Exacerbating the problem, victims of medical identity theft oftentimes struggle to resolve the issue because HIPAA regulations require the victim to be personally involved in the resolution of the crime.[49] In some cases, victims may not even be able to access medical records using their personal information because they include a false name or data points taken from another person's records. Consequently, only 10% of medical identity theft victims responded that they "achieve[d] a completely satisfactory conclusion of the incident."[50]

---

[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*

113. Moreover, it can take months or years for victims to even discover they are the victims of medical-related identity theft or fraud given the difficulties associated with accessing medical records and healthcare statements. For example, the FTC notes that victims may only discover their identity has been compromised after they:

- Receive a bill for medical services they did not receive;
- Get contacted by a debt collector about medical debt they do not owe;
- See medical collection notices on their credit report that they do not recognize;
- Find erroneous listings of office visits or treatments on their explanation of benefits (EOB);
- Receive information from their health plan that they have reached their limit on benefits; or
- Be denied insurance because their medical records show a condition they do not have.[51]

114. Perhaps most dangerous, however, is the potential for misdiagnoses or treatment. According to Ann Patterson, a senior vice president of the Medical

[51] *Medical Identity Theft, FAQs for Health Care Providers and Health Plans*, FTC, https://www.ftc.gov/business-guidance/resources/medical-identity-theft-faqs-health-care-providers-health-plans (last visited Nov. 7, 2025).

Identity Fraud Alliance, "About 20 percent of victims have told us that they got the wrong diagnosis or treatment, or that their care was delayed because there was confusion about what was true in their records due to the identity theft."[52] This echoes the Ponemon study, which notes that "many respondents are at risk for further theft or errors in healthcare records that could jeopardize medical treatments and diagnosis."[53]

115. According to a Consumer Reports article entitled *The Rise of Medical Identity Theft*, this outcome "isn't a hypothetical problem" as the "long tail on medical identity theft can create havoc in victims' lives."[54] As one example, a pregnant woman reportedly used a victim's medical identity to pay for maternity care at a nearby hospital. When the infant was born with drugs in his system, the state threatened to take the victim's four children away—not realizing his identity had been stolen. The victim ultimately had to submit to a DNA test to remove his

[52] Michelle Andrews, *The Rise of Medical Identity Theft*, Consumer Reports (Aug. 25, 2016), https://www.consumerreports.org/medical-identity-theft/medical-identity-theft/.

[53] *Fifth Annual Study on Medical Identity Theft*, PONEMON INSTITUTE (Feb. 2015), https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65 ("Ponemon Study").

[54] Michelle Andrews, *The Rise of Medical Identity Theft*, Consumer Reports (Aug. 25, 2016), https://www.consumerreports.org/medical-identity-theft/medical-identity-theft/.

name from the infant's birth certificate, but it took years to get his medical records corrected.[55]

116. Other types of medical fraud include "leveraging details specific to a disease or terminal illness, and long-term identity theft."[56] According to Tom Kellermann, "Traditional criminals understand the power of coercion and extortion. By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[57] Long-term identity theft occurs when fraudsters combine a victim's data points, including publicly-available information or data points exposed in other data breaches, to create new identities, open false lines of credit, or commit tax fraud that can take years to remedy.

117. Many victims of the Data Breach have likely already experienced significant harm as the result of the Data Breach, including, but not limited to, medical-related identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and healthcare

---

[55] *Id.*

[56] Andrew Steger, *What Happens to Stolen Healthcare Data?*, Healthtech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[57] *Id.*

statements, checking credit reports, and spending time and effort searching for unauthorized activity.

118. It is no wonder then that identity theft exacts a severe emotional toll on its victims. The 2017 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed;
- 67% reported anxiety;
- 66% reported feelings of fear related to personal financial safety;
- 37% reported fear for the financial safety of family members;
- 24% reported fear for their physical safety;
- 15.2% reported a relationship ended or was severely and negatively impacted by the identity theft; and
- 7% reported feeling suicidal.[58]

119. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances;
- 37.1% reported an inability to concentrate / lack of focus;

[58] *Identity Theft: The Aftermath 2017*, ITRC, https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf (last visited Nov. 7, 2025).

- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[59]

120. The unauthorized disclosure of the sensitive PHI and other Private Information to data thieves also deprives its owner of its value, which has been recognized by courts as an independent form of harm.[60]

121. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases

---

[59] *Id.*

[60] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig*., 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge— the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

122. As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. the unconsented disclosure of confidential information to a third party;

b. losing the value of the explicit and implicit promises of data security;

c. identity theft and fraud resulting from the theft of their Private Information;

d. costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

e. anxiety, emotional distress, and loss of privacy;

f. costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

g. unauthorized charges and loss of use of and access to their financial and investment account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts,

including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

h. lowered credit scores resulting from credit inquiries following fraudulent activities;

i. costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

j. the continued, imminent, and certainly impending injury flowing from potential fraud and identify theft posed by their Private Information being in the possession of one or many unauthorized third parties.

123. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement.

124. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes,

29% spent a month or more resolving problems" and that "[r]esolving the problems caused by identity theft [could] take more than a year for some victims."[61]

125. There may also be a significant time lag between when personal information is stolen and when it is misused for fraudulent purposes. According to the Government Accountability Office, which conducted a study regarding data breaches: "law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[62]

126. Plaintiff and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data

---

[61] Erika Harrell, & Lynn Langton, *Victims of Identity Theft, 2012*, U.S. Dep't of Just., Off. of Just. Programs Bureau of Just. Stats. (Dec. 2013), https://www.bjs.gov/content/pub/pdf/vit12.pdf.

[62] *PERSONAL INFORMATION: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO, http://www.gao.gov/new.items/d07737.pdf (last visited Nov. 7, 2025).

security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[63]

127. Because of the value consumers place on data privacy and security, insurers with robust data security practices are viewed more favorably by patients and can command higher prices than those who do not. Consequently, had patients known the truth about Defendants' data security practices—that they did not adequately protect and store their Private Information, including PHI—they would not have chosen an insurer that worked with Conduent or would have paid significantly less. As such, Plaintiff and Class Members did not receive the benefit of their bargain with Defendants because they paid for the value of services they did not receive.

128. Plaintiff and Class Members have a direct interest in Defendants' promises and duties to protect their Private Information, i.e., that Defendants not increase their risk of identity theft and fraud. Because Defendants failed to live up to their promises and duties in this respect, Plaintiff and Class Members seek the present value of identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Defendants'

[63] *Beyond the Bottom Line: The Real Cost of Data Breaches*, FireEye (May 2016), https://www.e-isac.info/content/files/2024/03/rpt-beyond-bottomline.pdf (last visited Mar. 29, 2024).

wrongful conduct. Through this remedy, Plaintiff and Class Members seek to restore themselves and Class Members as close to the same position as they would have occupied but for Defendants' wrongful conduct, namely Defendants' failure to adequately protect Plaintiff's and Class Members' Private Information.

129. Plaintiff and Class Members further seek to recover the value of the unauthorized access to their Private Information permitted through Defendants' wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's Private Information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class Members have a protectible property interest in their Private Information; (b) the minimum damages measure for the unauthorized use of personal property is its

rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

130. Because Defendants continue to hold the Private Information of consumers, Plaintiff and Class Members have an undeniable interest in ensuring that their Private Information is secured, remains secure, and is not subject to further theft.

## CLASS ACTION ALLEGATIONS

131. Plaintiff brings this class action on behalf of himself and all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure and Local Rule 23.1.

132. **Class Definition**: The Class that Plaintiff seeks to represent is defined as follows:

- All individuals in the United States whose Private Information was exposed in the Data Breach ("Nationwide Class").

133. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers, and directors, current or former employees, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies,

divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

134. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

135. **Numerosity, Fed. R. Civ. P. 23(a)(1)**: The members of the Class are so numerous that joinder of all of them is impracticable. Defendants have admitted that at least 10.5 million individuals in the United States had their data stolen. The Class is readily identifiable within Defendants' records.

136. **Commonality and Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3)**: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These common questions of law and fact are such that there is a well-defined community of interest in this litigation. The common questions of law and fact include, without limitation:

a. Whether Defendants owed Plaintiff and Class Members a duty to implement and maintain reasonable security procedures and practices to protect their Private Information;

b. Whether Defendants violated their duty to implement reasonable security systems to protect Plaintiff's and Class Members' Private Information;

c. Whether Defendants' breach of their duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiff and Class Members;

d. Whether Defendants owed a duty to Plaintiff and the Class to exercise due care in collecting, storing, safeguarding, and/or obtaining their Private Information;

e. Whether Defendants violated their duty to exercise due care in collecting, storing, safeguarding, and/or obtaining their Private Information;

f. Whether HCSC had a duty to supervise its business associates' or vendors' data security practices for Private Information;

g. Whether Defendants' breach of their duty to exercise due care in collecting, storing, safeguarding, and/or obtaining their Private Information directly and/or proximately caused damages to Plaintiff and Class Members;

h. Whether Defendants violated data breach notification laws by failing to timely notify Plaintiff and Class Members about the breach;

i. Whether Defendants violated the FTC act, HIPAA, and/or HITECH;

j. Whether Defendants acted negligently in connection with the monitoring and/or protection of Plaintiff's and Class Members' Private Information;

k. Whether Defendants adequately addressed and fixed the vulnerabilities that enabled the Data Breach;

l. Whether Plaintiff and Class Members are entitled to damages to pay for future protective measures like credit monitoring and monitoring for misuse of Private Information;

m. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach; and

n. Whether Class Members are entitled to compensatory damages, nominal damages, and/or punitive damages as a result of the Data Breach.

137. **Typicality, Fed. R. Civ. P. 23(a)(3)**: Plaintiff's claims are typical of the claims of the members of the Class because all Class Members had their Private Information compromised in the Data Breach and were harmed as a result.

138. **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition

of uniform relief to ensure compatible standards of conduct toward the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect the Class uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

139. **Adequacy, Fed. R. Civ. P. 23(a)(4)**: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no known interest antagonistic to those of the Class and his interests are aligned with Class Members' interests. Plaintiff was subject to the same Data Breach as Class Members, suffered similar harms, and faces similar threats due to the Data Breach. Plaintiff has also retained competent counsel with significant experience litigating complex class actions, including data breach cases involving multiple classes and data breach claims.

140. **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3)**: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action

treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

141. The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the limited resources of the Class with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

142. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

143. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

144. Unless a classwide injunction is issued, Plaintiff and Class Members remain at risk that Defendants will continue to fail to properly secure the Private Information of Plaintiff and Class Members resulting in another data breach, continue to refuse to provide proper notification to Class Members regarding the Data Breach, and continue to act unlawfully as set forth in this Class Action Complaint.

145. Defendants acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

146. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

- Whether Defendants owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

- Whether Defendants breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;
- Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;
- Whether an implied contract existed between HCSC and Plaintiff and Class Members, and the terms of that implied contract;
- Whether Defendants failed to implement and maintain reasonable and adequate security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and
- Whether Class Members are entitled to actual damages, additional credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendants' wrongful conduct.

## CLAIMS FOR RELIEF

## COUNT I
**Negligence/Negligence *Per Se***
***(On Behalf of Plaintiff and the Class)***

147. Plaintiff repeats and realleges every preceding allegation as though fully set forth herein.

148. Plaintiff and Class Members were required to submit their Private Information to Conduent, directly or indirectly, as a condition of receiving insurance coverage and related services.

149. Plaintiff and Class Members, through non-party HCSC, provided Private Information to Conduent including names, dates of birth, Social Security numbers, health information, and other highly sensitive information.

150. Conduent knew, or should have known, of the risks inherent in collecting and storing the Private Information of Plaintiff and Class Members.

151. As described above, Conduent owed duties of care to Plaintiff and Class Members whose Private Information had been entrusted with Conduent.

152. Plaintiff and Class Members were the foreseeable victims of insufficient safety and security practices by Conduent.

153. The duties of care owed by Conduent include a duty to exercise reasonable care in protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure or access.

154. Conduent's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous

courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

155. Under the FTC Act, Conduent had a duty to utilize adequate data security practices and systems to protect Plaintiff's and Class Members' Private Information.

156. Conduent breached its duties under the FTC Act by failing to encrypt or timely delete Plaintiff's and Class Members' Private Information from its systems and by not providing adequate data security practices and systems.

157. Conduent's violations of the FTC Act as described directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiff and Class Members.

158. Plaintiff and Class Members are within the class of persons the FTC Act was designed to protect and the type of harm that resulted from the Data Breach was the type of harm the FTC Act was intended to protect against.

159. Conduent's failures to comply with the FTC Act is negligence *per se*.

160. The duties of care owed by Conduent also include a duty to provide adequate data security, consistent with industry standards, to ensure that Conduent's systems and networks adequately protected Plaintiff's and Class Members' Private Information.

161. Conduent breached its duty to Plaintiff and Class Members in numerous ways, as described herein, including by:

- Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the Private Information of Plaintiff and Class Members;
- Failing to comply with their own privacy policies;
- Failing to timely notify Plaintiff and Class Members about the Data Breach;
- Failing to adequately monitor, evaluate, and ensure the security of its network and systems; and
- Failing to recognize in a timely manner that Private Information had been compromised.

162. Conduent's conduct was particularly unreasonable given the nature and amount of Private Information Conduent collected and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

163. Conduent acted with wanton disregard for the security of Plaintiff's and Class Members' Private Information. Defendants knew or reasonably should have known that they had inadequate data security practices to safeguard such

information, and Conduent knew or should have known that data thieves were attempting to access systems and networks containing Private Information such as that entrusted to Defendants.

164. Plaintiff's and Class Members' Private Information would not have been compromised but for Defendants' wrongful and negligent breach of their duties.

165. But for Conduent's wrongful and negligent breaches of the duties owed to Plaintiff and the Class Members, Plaintiff and the Class Members would not have been injured.

166. Conduent's failure to take proper security measures to protect the Private Information of Plaintiff and Class Members as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and exfiltration of Private Information by unauthorized third parties. Given that companies such as Conduent are prime targets for hackers, Plaintiff and Class Members are part of a foreseeable, discernible group that was at high risk of having their Private Information misused or disclosed if not adequately protected by Conduent.

167. It was also foreseeable that Conduent's failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiff and Class Members.

168. As a direct and proximate result of Conduent's conduct, Plaintiff and Class Members have and will suffer damages in an amount to be proven at trial, including: (i) the loss of rental or use value of their Private Information; (ii) the unconsented disclosure of their Private Information to unauthorized third parties; (iii) out-of- pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; and (ix) any nominal damages that may be awarded.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class set forth herein, respectfully requests the following relief:

A. That the Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is the proper class representative; and appoint Plaintiff's counsel as Class Counsel;

B. That the Court grant permanent injunctive relief to prohibit and prevent Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C. That the Court award Plaintiff and Class Members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D. That the Court award punitive or exemplary damages, to the extent permitted by law;

E. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

F. That Plaintiff be granted the declaratory and injunctive relief sought herein;

G. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

H. That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial in the instant action.

November 7, 2025

Respectfully submitted,

_*/s/ David A. Straite*___________
David A. Straite
Corban S. Rhodes*
**DICELLO LEVITT LLP**
485 Lexington Avenue
Suite 1001
New York, New York 10017
Tel.: 646-933-1000
dstraite@dicellolevitt.com
crhodes@dicellolevitt.com

Adam J. Levitt*
Amy E. Keller*
**DICELLO LEVITT LLP**
Ten North Dearborn Street,
Sixth Floor
Chicago, Illinois 60602
Tel.: 312-214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com

***Counsel for Plaintiff and the Proposed Class***